[Civ. No. 9029.   Third Dist.   May 6, 1957.]

WELLINGTON H. SNEED, as Trustee in Bankruptcy, etc., Appellant, v. GAREFALIA KANELOS, Individually and as Administratrix, etc., Respondent.

Bradford, Cross, Prior & Dahl and Thomas W. Loris for Appellant.

Wilke & Sapunor for Respondent.

WARNE, J. pro tem.*—Appellant Wellington H. Sneed, the trustee in bankruptcy of the estate of Andrew Kanelos and James Kanelos, doing business as Kanelos Bros., a copartnership, bankrupt, brought suit against Garefalia Kanelos, individually and as the adminstratrix of the estate of James Kanelos, to establish his claim as a partnership asset

---

*Assigned by Chairman of Judicial Council.

to certain real property and to establish his claim as a partnership asset to the proceeds of an insurance policy on the life of James Kanelos. Judgment was entered in favor of the defendant. The plaintiff appeals both from the judgment and from the order denying his motion for a new trial. Since an order denying a motion for a new trial is not an appealable order, the appeal from said order is dismissed. (Code Civ. Proc., § 963.)

James Kanelos, a partner in the firm of Kanelos Bros., died in July, 1948. His brother Andrew continued the business. In January, 1949, a petition for bankruptcy proceedings was instituted, and Andrew and James Kanelos, doing business as Kanelos Bros., were adjudicated bankrupt. No claim against the estate of James Kanelos was filed until 1951, when the trustee brought suit to establish a claim to certain property in which the partnership was alleged to have an interest.

In 1924, James acquired the real property which the trustee alleges was a partnership asset. Title was taken in James' name alone, and he paid the purchase price. James also acquired a slaughterhouse which was on the property. James built a home on the property in which he and his brother lived until 1939. Appellant offered evidence to show that at about the time James purchased the property, Andrew sent a dowry to Greece for their sister, and that by providing the funds for the dowry, he (Andrew) was to have a half interest in the property. Also at the time of the purchase, Andrew was to be married, and James took title in his name to avoid any possible trouble with Andrew's wife in case the marriage did not work out. After James had purchased the property he built a home upon the land, using his own funds and labor in so doing. Andrew had nothing to do with the construction, and he did not furnish any of the money used in the purchase of materials. When the house was completed James lived in it, and after Andrew married, he permitted Andrew and his wife to live in the house also. When James married the defendant Garefalia Kanelos, he asked Andrew to move out of the house, which Andrew did; and he, Andrew, then built a home of his own.

There is no evidence whatever that Andrew paid any portion of the purchase price of the land or of the old slaughterhouse building owned by one Kareazis. There is no evidence that before the purchase of the land, James made any promise to hold a half interest, or any interest, in the property in

trust for his brother, Andrew, except the evidence that Andrew was to have a half interest because he provided the funds for their sister's dowry. On the contrary, all of the dealings of the brothers after 1924 indicate that James was the owner of the property.

Mr. Kareazis testified that after he sold the old slaughterhouse to James Kanelos, he paid rent for the use of the slaughterhouse at a rate of $25 per month, and that he always paid the rent to James Kanelos and never to Andrew. Five other tenants also testified that they paid rent to James for the use of the slaughterhouse or the small dwelling house on the same property, or for both, at amounts varying from $15 to $30 per month. None of these tenants ever paid rent to Andrew or had any idea that Andrew claimed an interest in the property. He, Andrew, never demanded rent from any of these persons. According to the testimony of Cladianos, when he and Andrew were first partners in 1931 to 1933, they used the old slaughterhouse to kill animals, and they used partnership funds to pay rental to James for the use thereof at the rate of $15 per month.

The record also shows that either James or his wife, Garefalia, paid all the taxes assessed against the land and never sought or received reimbursement for any share thereof from Andrew. James maintained the dwelling house and the small house upon the land and paid all expenses involved in such maintenance. Andrew never paid any portion of the cost of such maintenance.

The record also shows that when the partnership of Kanelos Bros. and D. Cladianos was formed in 1937, Mr. Himmelman, who was the accountant for the partnership, discussed the ownership of the property with James and Andrew when he first set up the partnership books, and at that time the land and improvements were not carried on the books as a partnership asset, nor at any later date; that the only things relating to real property that were carried as fixed assets of the partnership were those improvements which were put on the land after the formation of the partnership.

There is also evidence that in 1943 a written lease was prepared, under the terms of which the partnership leased the land from James for a period of five years at a monthly rental of $75. This lease was signed for the partnership by D. Cladianos.

The record further discloses that James and his wife bor-

rowed money upon the property and executed deeds of trust to various banks as security for these loans, and that Andrew was aware of these loans but never participated therein, either in the execution of the loans or in the proceeds thereof.

To establish the land as partnership property, appellant places some reliance on the fact that Andrew and James were brothers and very close to each other, and that the improvements made after the formation of the partnership were paid for from partnership funds. There is no merit in this contention. The improvements which were placed upon the land after the partnership was formed, were always, as distinguished from the land, considered partnership property. Respondent's counsel points out, in his brief, that the trustee took charge of those improvements and sold them at a trustee's sale for the benefit of the bankrupt.

Appellant also contends that the partnership may claim ownership of the real property, notwithstanding the fact that title was acquired by James with his own private funds or that it was owned by him prior to the formation of the partnership, the real property having been dedicated to partnership use and used solely for its benefit. He cites *Swarthout* v. *Gentry,* 62 Cal.App.2d 68 [144 P.2d 38], in support of this contention. In the instant case we have an entirely different factual situation from that in the Swarthout case. The land standing in James' name was never dedicated to the sole partnership use. As heretofore noted, it was at all times carefully distinguished from partnership property, and was not at any time carried on the partnership records as partnership property. It was considered at all times as the individual and separate property of James Kanelos. It was so considered by the partnership accountant and bookkeeper and also by Andrew Kanelos and the partner, D. Cladianos. Both the partnership and various other individuals who used the land paid rental to James for the use thereof. The indisputable fact is that the land was purchased by James in 1924 at a time when James and Andrew were not partners. James did not become a member of the partnership with Andrew and D. Cladianos until 1937. It is said in *Perelli-Minetti* v. *Lawson,* 205 Cal. 642 [272 P. 573], " ' "The true method of determining, as between the partners themselves, whether land standing in the name of the individuals is or is not to be treated as partnership property, is to ascertain from their conduct and course of dealing the understanding

and intention of the partners themselves, which, when ascertained should unquestionably control." ' "

Appellant also claims that James held the property in trust for Andrew. He argues that when the property was purchased, the brothers agreed that Andrew was to have a one-half share. The answer to this is that the trial court, upon conflicting evidence, found that the evidence was insufficient to establish the trust. ■ "When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its determinations for those of the trial court." (*Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427, 429 [45 P.2d 183].)

■ The second cause of action involves a life insurance policy on James' life in the amount of $40,000. Appellant claims that when James took out the insurance in 1947, there was an oral agreement that the insurance would be made payable to the partnership, the premiums thereon to be paid out of partnership funds and charged to partnership expense. The trial court, in discussing this matter in its memorandum opinion, says, "No constructive trust has been established by the record, and while there are suspicions and innuendoes of dominance by the one brother over the other, it cannot be said there is proof sufficient to warrant a recovery by plaintiff." The evidence shows that it had long been the custom of each of the partners to use partnership funds for the payment of personal expenses, leaving it to the bookkeeper as best he could to make proper adjustments in the partnership accounts to reflect the drawing of the two partners. Each partner drew checks directly upon the partnership account to pay his personal obligations. Neither partner, during the lifetime of the other, ever claimed as partnership property any property or assets thus acquired by the other. When Andrew built his own home after James married, he used partnership funds to pay for building the house. The record does not show that James claimed any interest in this house, for the money used to build the house was merely charged against the partnership accounts of Andrew. It appears that this was common practice, and each partner did it with the full knowledge and acquiescence of the other. In 1947 Himmelman, the firm accountant, suggested to the partners that they consider some sort of partnership insurance, and that they enter into some formal written agreement pertaining to such insurance. Apparently, the partners did discuss insurance on several different occasions but never came to any agree-

ment about the same. The partners even went so far as to have medical examinations to determine their eligibility for insurance, and such examinations disclosed that only James could pass the physical examination. In order to obtain the kind of insurance suggested by Himmelman, both partners would have had to be insurable. James Kanelos purchased a policy of insurance upon his own life, making his wife the beneficiary of said policy. The first year's premium was charged as a partnership expense on the books of the partnership. It is not clear who, if anyone, paid the second year's premium. Andrew did not bring any action against James' estate to recover the proceeds of the insurance policy. It is only his heirs and assignees in bankruptcy who make the claim that the $40,000 collected on the policy at the time of James' death is an asset of the partnership. The fact that the first premium was paid by a check drawn upon the partnership account has no real significance since it was in accord with the custom and practice of the partners to pay their obligations with partnership checks.

There was no resulting trust for the reason that the evidence fails to show that James Kanelos committed any wrongful or illegal act when he paid the premium upon his policy of life insurance out of the partnership funds. He did not embezzle any funds from the partnership, and, according to the appellant, he used partnership funds to purchase the policy upon the direct request and with the knowledge of Andrew. Therefore, *Brodie* v. *Barnes,* 56 Cal.App.2d 315 [132 P.2d 595], and cases cited therein, holding that where one has embezzled funds and used them for the payment of premiums for insurance on his life, a trust is created in favor of the party from whom they were embezzled, are not applicable to the factual situation now before this court. We conclude that there is no merit in appellant's contentions.

The judgment is affirmed.

Peek, J., and Schottky, J., concurred.